**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Octavio CARREON, and Armando
Melendez, Defendants–
Appellants.**

No. 92–8682.

United States Court of Appeals,
Fifth Circuit.

Jan. 5, 1994.

---

**1228**

Bernard J. Panetta, Mary Stillinger, Caballero, Panetta & Ortega, El Paso, TX, for Carreon.

Richard D. Esper, El Paso, TX, for Melendez.

Richard L. Durbin, Jr., Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for plaintiff-appellee.

Before VAN GRAAFEILAND *, SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

The central legal issue in this appeal is whether "relevant conduct" as defined in § 1B1.3(a)(1)(B) of the Sentencing Guidelines includes conduct occurring before a criminal defendant joins a conspiracy.

Defendant–Appellants Armando Melendez and Octavio Carreon were convicted of conspiring to import more than 100 kilograms of marihuana in violation of 21 U.S.C. §§ 952, 960, and 963. Carreon was also convicted of conspiring to possess with intent to distribute more than 100 kilograms of marihuana in violation of 21 U.S.C. §§ 841 and 846, and of bribing a public official in violation of 18 U.S.C. § 201. Carreon questions whether he can be sentenced under U.S.S.G. 1B1.3(a)(1)(B) for conduct occurring before he joined the conspiracy; Melendez disputes whether the district court's failure to make explicit findings warrants remand for resentencing. Melendez further challenges the district court's failure to provide him with exculpatory or impeachment information contained in the Presentence Investigation Reports ("PSRs") of coconspirators turned government witnesses.

We hold today that the "reasonable foreseeability" requirement contained in U.S.S.G. 1B1.3(a)(1)(B) is prospective only, and consequently cannot include conduct occurring before the defendant joined the conspiracy. We also conclude that the district court's failure to make explicit findings for either Melendez or Carreon requires us to "second guess" the basis of the district court's sentencing as to both of these defendants. Consequently, we must reverse and remand both sentences for findings and resentencing. Finally, we conclude that, in light of *United States v. Jackson,* admittedly rendered after the instant trial and sentencing, the district court's failure to review the Presentence Investigation Reports ("PSRs") of government witnesses requires remand of Melendez's conviction to determine whether those PSRs contained any material exculpatory or impeachment information and, if they did contain such information, whether failure to provide it was harmless error.

---

* Senior Circuit Judge of the Second Circuit, sitting by designation.

# I

## FACTS AND PROCEEDINGS

A procession of coconspirators turned government witnesses[1] testified that Armando Melendez and his father, Jesus "Chuy" Melendez, were involved in an extensive marihuana trafficking conspiracy between 1985 and 1992. These witnesses testified to purchasing and transporting extensive quantities of marihuana acquired from Armando Melendez and his family; through the years this marihuana was transported in everything from vans to trucks to planes to avoid detection. Indeed, several of these witnesses were caught during this period while attempting to smuggle marihuana for the Melendezes.[2]

In 1989 Chuy Melendez, the patriarch of the clan, was murdered. By the end of 1989 a change had occurred in this drug trafficking scheme. Defendant–Appellant Octavio Carreon joined with Armando Melendez and others to bribe U.S. Border Patrol Agent Patrick Maynes—who was a childhood friend of Carreon—to provide Melendez and Carreon with information on law enforcement activity in the area where they smuggled.[3] Maynes was working undercover, however, and spent the next year and one-half gathering evidence during meetings with Melendez, Carreon, and other members of the conspiracy.

The Melendez–Carreon drug smuggling business terminated in April 1992. During April, Maynes met several times with various members of the conspiracy and agreed to

transport marihuana. Maynes eventually transported 327 pounds of marihuana to Albuquerque on April 12, where it was unloaded, moved to a residence, and then seized by police. On April 16, government agents moved in and seized corroborating evidence from the residences of Melendez and Carreon.[4]

Both Carreon and Melendez were indicted, along with thirteen others, in May 1992 for conspiring to import and conspiring to possess more than 100 kilograms of marihuana.[5] The indictment alleged that this conspiracy operated from the beginning of January 1985 to the beginning of May 1992. Carreon and Melendez were also indicted for bribing a public official.[6]

In pretrial motions, Carreon filed for and was granted his request to be severed and tried only with Melendez. Melendez filed a pretrial motion to adopt all pretrial motions filed by his codefendants, which included a motion by codefendant Christopher Peter Bush requesting access to the PSRs of the government witnesses. The district court denied Bush's motion. On the day of trial, Melendez made his own separate motion requesting access to the PSRs of all government witnesses. The district court dismissed this request during trial as "being moot."

The jury found both Melendez and Carreon guilty of the conspiracy to import more than 100 kilograms of marihuana, but found only Carreon guilty of the conspiracy to pos-

---

1. Charles Aragon, William Delval, James Grice, Patrick Trujeque, Lowell Ray Donaldson, Gerardo Soto–Quinonez, Jose Guzman, and Lisa Wagner, all of whom were coconspirators, testified against Melendez.

2. In March or April 1988, Donaldson crashed while attempting to fly an airplane containing 1300 pounds of marihuana into the United States. This crash led to the arrest and conviction of Donaldson. In November 1988, Wagner and another person were arrested while attempting to enter El Paso from Mexico with 100 pounds of marihuana. In December 1988, Soto-Quinonez was arrested in El Paso while attempting to transport 100 pounds of marihuana. All of the witnesses testified that they were smuggling marihuana for the Melendez organization when they were arrested.

3. According to U.S. Border Patrol Agent Patrick Maynes, Carreon was previously part of his own

family's marihuana-smuggling organization, which was on friendly terms with the Melendezes. For example, Maynes testified that Carreon told him that Chuy Melendez had previously helped the Carreons collect a one-million dollar debt from a rival, the cocaine-smuggling Sandoval family. Carreon and the government vigorously dispute whether such activity indicates that Carreon conspired with Melendez and his organization before the end of 1989.

4. Agents seized from the residence of Melendez, inter alia, a checkbook containing a check stub for 54,897,000 pesos made out to one of the members of the conspiracy. From Carreon's residence, agents seized a notepad that included the names of several members of the conspiracy.

5. 21 U.S.C. § 952 (importation); 21 U.S.C. § 841 (possession).

6. 18 U.S.C. § 201.

sess. Carreon was also the only one found guilty of the bribery charge.

In sentencing the defendants, the district court accepted the drug quantity findings of 131,358 kilograms contained in the PSRs of Melendez and Carreon. These findings attributed all marihuana discussed at trial during the whole course of the conspiracy—from 1985 to 1992—to both Melendez and to Carreon. The 131,358 kilograms established a base offense level of 40 for both defendants; the district court adjusted this score upward two points as to Melendez because he had a supervisory role in the conspiracy, and downward two points as to Carreon because he was a minor participant.[7]

Both defendants were sentenced within the ranges established by the Sentencing Guidelines. Carreon was sentenced to 235 months imprisonment on the conspiracy counts and a concurrent 180-month term on the bribery count. Melendez was sentenced to 360 months imprisonment on the conspiracy count. Both were sentenced to five years of supervised release. In addition, Carreon received a $25,000 fine while Melendez received a $100,000 one. Both defendants timely appealed.

## II

## ANALYSIS

### A. *Relevant Conduct Under the Sentencing Guidelines*

Under § 2D1.1(a)(3) of the Sentencing Guidelines, the offense level of a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved in the offense. This quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his "relevant conduct" under § 1B1.3(a)(1)(B) of

the Guidelines. Relevant conduct for conspiratorial activity is defined in § 1B1.3(a)(1)(B) as "all *reasonably foreseeable* acts and omissions of others in furtherance of jointly undertaken criminal activity."[8] We made clear in *United States v. Evbuomwan*[9] that for conspiratorial conduct to be attributed under § 1B1.3(a)(1)(B), that conduct must be both "reasonably foreseeable" to the defendant and within the scope of the defendant's agreement.

■ Both Melendez and Carreon challenge the district court's calculation of their sentence under § 1B1.3, albeit on different grounds. How the Guidelines are to be interpreted is a question of law, which we review de novo.[10] Factual findings under the Guidelines are reviewed only for clear error.[11]

#### 1. *Requirement of Findings*

■ Melendez argues that the district court erred in failing to make explicit findings as to how it calculated the drug quantities attributed to him under § 1B1.3. Specifically, Melendez contends that the district court's failure to find 1) that the drugs attributed to him in the PSR were within the scope of and in furtherance of a conspiracy that he joined, and 2) that all of the marihuana quantities included in the PSR were reasonably foreseeable by him, warrants remand for findings and resentencing. In the instant case, the district court simply adopted the PSR report, including the quantity attributed from the conspiracy, as "well-justified." The government contends that this adoption constitutes an implicit finding sufficient to establish both that Melendez was a member of the conspiracy, and that the quantities at issue were reasonably foreseeable.

■ In *United States v. Puma*[12] we remanded for resentencing because the district

---

7. Both defendants had a criminal history category of I.

8. United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(1)(B) (Nov. 1993) (emphasis added).

9. 992 F.2d 70, 72 (5th Cir.1993).

10. *E.g., United States v. Lara-Velasquez,* 919 F.2d 946, 953 (5th Cir.1990).

11. *Id.*

12. 937 F.2d 151, 160 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992). *But see United States v. Lghodaro,* 967 F.2d 1028, 1030 (5th Cir.1992) (concluding

court had failed to make an express finding that the conspiratorial activity at issue was reasonably foreseeable as required by former § 2D1.4 of the Guidelines—the same type of finding as required here by § 1B1.3(a)(1)(B). Moreover, Rule 32 of the Federal Rules of Criminal Procedure mandates that the sentencing court make findings regarding any controverted facts in the PSR, or state that those facts will not be taken into account in sentencing.[13] We have nevertheless rejected the proposition that a court must make a "catechismic regurgitation of each fact determined"; instead, we have allowed the district court to make implicit findings by adopting the PSR.[14] This adoption will operate to satisfy the mandates of Rule 32 when the findings in the PSR are so clear that the reviewing court is not left to "second-guess" the basis for the sentencing decision.[15]

Here, the PSR simply accepts virtually all of the drug quantities discussed in the testimony at trial, and attributes those quantities to Melendez. In response to Melendez' voluminous objections to those quantities—including specific objections to the reasonable foreseeability of many of the transactions and events involving those quantities—the probation officer preparing the report stated that he was submitting the matter "for the Court's consideration."

The problem here is that we are unable to determine how the district court resolved these issues. For example, the government's theory supporting the foreseeability finding—that Melendez was the "key man" in the

smuggling organization, and hence was aware of all the transactions engaged in by that organization—was at least partially rejected by the court at the sentencing hearing when it rejected the PSR finding that Melendez was the organizer or leader of the organization.[16] In rejecting this finding, the court stated:

> As to the role in the offense, I think it's somewhat exaggerated to characterize [Melendez] as the mastermind or as the organizer or leader. He was a key member, of course, and occupied some supervisory role, but I think a two-level adjustment rather than four would be more appropriate under the evidence I heard in the case.

Although this statement appears to resolve the "jointly agreed to" issue by concluding that Melendez was a member of the conspiracy in some capacity, it appears to cloud the foreseeability issue under the government's theory of the case. We thus are left to second guess the basis for the district court's calculation here and must consequently remand for findings.[17]

### 2. Reasonable Foreseeability and Prior Conduct

Carreon contends that he cannot be sentenced under § 1B1.3(a)(1)(B) for conduct occurring before he joined the conspiracy. Simply put, Carreon insists that the requirement of "reasonable foreseeability" contained in § 1B1.3(a)(1)(B) cannot be backward looking to include prior conduct. Before we ad-

---

that "reasonable foreseeability" finding, although not express, was clearly part of district court's conclusion that the defendant was involved in joint activity).

**13.** FED.R.CRIM P. 32(c)(3)(D).

**14.** *United States v. Sherbak,* 950 F.2d 1095, 1099 (5th Cir.1992), *see also Lghodaro,* 967 F.2d at 1030 (accepting an implied finding as to "reasonable foreseeability" when that finding was clearly part of the district court's conclusion that the defendant was involved in joint activity).

**15.** *United States v. Hooten,* 942 F.2d 878, 881 (5th Cir.1991).

**16.** The PSR recommended a four-level increase based on this finding. Section 3B1.1(a) of the

Guidelines authorizes this increase when the defendant is the "organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a).

**17.** In remanding for findings, we express no opinion whether the quantity calculated in the PSR may ultimately prove correct. We do require, though, that the district court find 1) when Melendez joined the conspiracy or conspiracies, 2) what drug quantities were within the scope of Melendez's conspiratorial agreement or agreements, and 3) of these drug quantities, which were reasonably foreseeable to Melendez. By remanding for these findings, we protect the integrity of the fact finding process and maintain the proper delineation of roles between the appellate and the district courts. Such findings, of course, remain subject to review only for clear error. *E.g., Lara–Velasquez,* 919 F.2d at 953.

dress this contention, we pause to note that Carreon's sentence suffers from the deficiency that infected the sentencing of Melendez. The district court followed the same approach as it had in sentencing Melendez by concluding that the drug quantities listed in the PSR of Carreon—which are virtually identical to the ones listed in the PSR of Melendez—were "well justified."

On appeal, Carreon attempts to limit the scope of his agreement (and hence his sentencing accountability) by contending that the instant case contains at least two conspiracies: the bribery-importation conspiracy involving Maynes, and an earlier importation conspiracy centered around Melendez and the government witness, Charles Aragon. Carreon concedes he was a member of the Maynes conspiracy but argues that he had no involvement in the earlier Melendez–Aragon conspiracy. The government counters that there was only one conspiracy here—with Melendez as the "key man" tying all the disparate transactions and actors together— and that, consequently, the scope of Carreon's agreement could extend to all activity engaged in by that conspiracy. The simple adoption of Carreon's PSR by the district court unfortunately does not disclose what the court found regarding this issue.

Carreon and the government also hotly contest whether Carreon entered the conspiracy (or conspiracies) in 1987 or in 1989, but, given the absence of findings, we cannot discern what the district court found regarding this issue either. The parties contest this issue for different reasons though: as noted above, Carreon contends that relevant conduct as defined in § 1B1.3(a)(1)(B) cannot include conduct occurring before he joined the conspiracy. The drugs attributed to Carreon by the PSR obviously include quantities arising out of transactions that occurred before he joined the conspiracy, as they include transactions that occurred from 1985 to 1992. Accordingly, Carreon's sentence is presently premised on the notion that relevant conduct can include conduct occurring before he joined any conspiracy. As such, the "relevant conduct-prior conduct" issue is a necessary part of the sentence challenged and is thus properly reviewable.[18] As this issue is *res nova* in this circuit,[19] we begin by turning to the applicable provisions in the Sentencing Guidelines.

### a. The Sentencing Guidelines

The appropriate starting point is the plain language of the Guidelines themselves.[20] Both the Chairman and the General Counsel of the Sentencing Commission (the "Commission") have referred to the relevant conduct section as the "cornerstone" of the Guidelines.[21] Including relevant conduct in sentencing allows the defendant to be sentenced based, at least in part, on the seriousness of his actual behavior.[22] Tying the sentence to the seriousness of the actual offense in turn helps effectuate the congressional policy of proportionality—that the "system impose[ ] appropriately different sentences for criminal conduct of differing severity." [23]

Relevant conduct under § 1B1.3 includes acts engaged in by coconspirators—a particularly important provision in drug conspiracy prosecutions given that the sentences in such prosecutions are determined based on drug

---

18. Even were we to remand solely for findings, the district court would have to face this issue in recalculating Carreon's sentence, as it is likely that the district court's express finding regarding the scope of the conspiratorial agreement would comport with the finding *implicit* in its present resolution of Carreon's sentence. Presumably, the district court would also continue to believe—absent guidance from this court—that Carreon can be held accountable for prior conduct. Under these circumstances, judicial economy warrants disposing of this issue now rather than risk a needless appeal and remand.

19. The parties concede that no Fifth Circuit case has decided this issue.

20. Cf., *Stinson v. United States*, — U.S. —, —— ——, 113 S.Ct. 1913, 1917–19, 123 L.Ed.2d 598, 606–08 (1993) (the Guidelines and the Commission's Policy Statements and Commentary are generally binding on the courts).

21. See, William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Sentencing Guidelines*, 41 S.C.L.Rev. 495, 496 (1990).

22. *Id.* at 497.

23. U.S.S.G. Ch. 1, Pt. A(3).

quantities attributable to the defendant,[24] and that in many instances the defendant will not be directly involved in many of the transactions giving rise to those quantities. Nonetheless, the Guidelines have retained their emphasis on sentencing the defendant as an individual: The Commentary to § 1B1.3 states that "the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." [25]

Determining the appropriate degree of sentencing accountability for conspiratorial activity—while still serving the need for proportionality in sentencing and for sentencing the defendant as an individual—has proven difficult for the Commission. A review of the changes effected by the Commission sheds some light on the Commission's intent relative to these issues.

The original Guidelines contained only a cryptic reference to accountability for conspiratorial activity.[26] Perhaps recognizing the weaknesses of this approach, the Commission promulgated an emergency amendment that became effective January 15, 1988.[27] This amendment referred to conspiratorial accountability as conduct "for which the defendant would be otherwise accountable," and defined such conduct to include "conduct in furtherance of the conspiracy that was *known to or was reasonably foreseeable* by the defendant." [28]

In an amendment effective November 1, 1989, the Commission dropped the "known to" language, thus including conspiratorial conduct only if that conduct was "reasonably

foreseeable" to the defendant.[29] This amendment also attempted to distinguish the individual from the conspiracy as a whole by stating:

> Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.[30]

In its most recent amendment, which became effective November 1, 1992 (the 1992 Amendment), the Commission once again attempted to clarify and to delineate the extent of liability for conspiratorial activity. The Commission first moved the "reasonable foreseeability" element into the text of the guideline.[31] Next, the Commission rewrote its commentary to emphasize that the "scope of the agreement" and "reasonable foreseeability" are independent and necessary elements. The second note to the new Commentary now provides in pertinent part:

> In the case of jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was *both*:
>
> (i) in furtherance of the jointly undertaken criminal activity; *and*

24. U.S.S.G. § 2D1.1(a)(3).

25. U.S.S.G. § 1B1.3, comment. (n. 1).

26. The original Guidelines defined "relevant conduct" as "all conduct, circumstances, and injuries relevant to the offense of conviction ..." U.S.S.G. § 1B1.3 (Nov. 1987). The only apparent reference to accountability for conspiratorial conduct was the statement that such conduct shall include all conduct that is part of "a common scheme or plan." *Id.*

27. *See,* U.S.S.G.App. C (amendment 3). This emergency amendment was upheld as statutorily

authorized in *United States v. Frederick,* 897 F.2d 490 (10th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 171, 112 L.Ed.2d 135 (1990).

28. U.S.S.G.App. C, amend. 3.

29. U.S.S.G.App. C, amend. 78.

30. *Id.* The Commission stated that the purpose of this amendment was to clarify the definition of conduct for which the defendant is "otherwise accountable." *Id.*

31. U.S.S.G.App. C, amend. 439.

(ii) reasonably foreseeable in connection with that criminal activity.[32]

Finally, the Commission emphatically rejected the notion that criminal liability and sentencing accountability are coextensive. The first note of the Commission's new Commentary now states:

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under [§ 1B1.3] the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.[33]

In sum, changes wrought by the Commission in § 1B1.3 indicate that the Commission has developed "reasonable foreseeability" as a means to limit the sentencing accountability of a defendant. The Commission has apparently developed this limit to ensure that the congressional goal of proportionality is served—that the sentence of the defendant is indeed tied to the "specific acts and omissions for which the defendant is to be held accountable." [34]

b. *Circuit Law and "Reasonable Foreseeability"*

Like the Commission, those circuits which have addressed this issue have struggled to ascertain the appropriate limits of sentencing accountability for conspiratorial activity. Specifically, other circuits have disagreed on whether "reasonable foreseeability" under § 1B1.3 may include conduct occurring before a defendant joins a conspiracy. In two opinions predating the 1992 Amendments, *United States v. Miranda–Ortiz* [35] by the Second Circuit and *United States v. Edwards* [36] by the Seventh, both courts concluded that "reasonable foreseeability" may include prior conduct. In contrast, in two opinions following [37] that amendment, *United States v. O'Campo* [38] by the First Circuit and *United States v. Petty* [39] by the Ninth, those courts flatly rejected the proposition that reasonable foreseeability can be backward-looking to encompass prior conduct.

In *Miranda–Ortiz* the Second Circuit simply assumed without discussion that prior conduct could be reasonably foreseeable under the Guidelines, although the court remanded that case for resentencing to determine whether the defendant actually knew, or should have known, of the drug quantities involved in the conspiracy before he joined.[40] In *Edwards* the Seventh Circuit concluded that past conduct can be "reasonably foreseeable" by analogizing to cases in which defendants were held liable for large quantities of drugs based on their degree of participation in the conspiracy.[41] These cases, however, either did not address the prior conduct issue or involved drug transactions that occurred after the defendant joined the conspiracy.[42]

32. *Id.* (emphasis added).

33. *Id.*

34. *Id.* The Chairman and the General Counsel of the Commission make this point in their article on relevant conduct. Wilkins & Steer, *supra* note 21 at 511. The First Circuit, in *United States v. O'Campo*, 973 F.2d 1015, 1026 (1st. Cir.1992), also concluded that "reasonable foreseeability" has been developed as the "central concept" to limit a defendant's sentencing accountability for relevant conduct. *Id.* at 1023–26. We note that Judge Stephen Breyer, a member of the first Commission, was a member of the *O'Campo* panel.

35. 926 F.2d 172, 178 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991).

36. 945 F.2d 1387 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).

37. Although *O'Campo* was decided before the 1992 Amendment became effective, the *O'Campo* court referred to this amendment to inform its analysis and ultimate disposition of the case. *O'Campo*, 973 F.2d at 1025 & n. 10.

38. 973 F.2d 1015, 1026 (1st Cir.1992).

39. 982 F.2d 1374, 1377 (9th Cir.1993).

40. *Miranda–Ortiz*, 926 F.2d at 178.

41. *Edwards*, 945 F.2d at 1394–96.

42. For example, the *Edwards* court discussed *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991), which addressed the scope of a conspiracy under the substantive criminal law, and *United States v. Farrell*, 893 F.2d 690 (5th Cir. 1990), which addressed sentencing accountability for planned future purchases of drugs. *Edwards*, 945 F.2d at 1394–97.

The *Edwards* court·justified these analogies by postulating that reasonable foreseeability incorporated the limiting principle contained in substantive conspiracy law, namely, that the scope of liability is determined by the scope of the agreement.[43]

The approach used by the Seventh Circuit in *Edwards* is troubling. That approach—which treats the scope of the agreement as defining the extent of what is reasonably foreseeable—contradicts our requirement in *Evbuomwan* (and the Guidelines requirement in the 1992 Amendment) that the sentencing court must find both that the defendant agreed to the joint criminal activity, *and* that the agreed-to activity must also be reasonably foreseeable. The *Edwards* approach is also inconsistent with the clear statement in the Guidelines' Commentary that sentencing accountability and criminal liability are not necessarily coextensive.[44]

In contrast to the *Edwards* approach, the First Circuit in *O'Campo* treated reasonable foreseeability as a separate element and then concluded that it would be oxymoronic to conclude that "prior conduct" could be "reasonably foreseeable."[45] The Ninth Circuit in *Petty* agreed with the *O'Campo* court's rejection of *Edwards* by observing first that the concept of relevant conduct contained in the Guidelines repudiates "the general[ly] harsh

law of conspiracy that a conspirator is 'bound by all that has gone on before in the conspiracy,'"[46] and second that courts do not have a warrant to turn the notion of foreseeability 180 degrees to apply it to prior conduct.[47]

### c. *Resolution*

We conclude that the approach used by the First and Ninth Circuits in *O'Campo* and *Petty* is the better reasoned one, as it more closely follows the dictates of the Guidelines.[48] Applying foreseeability only prospectively comports with the plain meaning of the term "foreseeable."[49] It also effects the individualized sentencing polices underlying the Guidelines "relevant conduct" provision: that sentencing is focused on "the specific acts and omissions for which the defendant is to be held accountable."[50] Such an approach ensures that the congressional policy of proportionality is served, as the sentence of the defendant is tied to the severity of the defendant's conduct.[51] Finally, the approach used in *O'Campo* and *Petty*, unlike the one in *Edwards*, is consistent with the requirement we imposed in *Evbuomwan* and the Commission imposed in their 1992 Amendments—that the "scope·of the agreement" and "reasonable foreseeability" are independent and necessary elements of relevant conduct under § 1B1.3(a)(1)(B). We thus hold today that "relevant conduct" as

43. *Edwards*, 945 F.2d at 1396.

44. U.S.S.G. § 1B1.3, comment. (n. 1). As noted, the *Edwards* decision was rendered before this commentary was added to the Guidelines.

45. *O'Campo*, 973 F.2d at 1026.

46. *Petty*, 982 F.2d at 1376 (quoting *United States v. DiCesare*, 765 F.2d 890, 900 (9th Cir.1985)).

47. *Id.*

48. We are, of course, bound by the Guidelines absent some inconsistency with statutory authority. This principle also applies to the commentary contained in the Guidelines: Such commentary is binding unless it is plainly erroneous or inconsistent with the applicable guideline. *Stinson*, —— U.S. at ——, 113 S.Ct. at 1919, 123 L.Ed.2d at 608.

49. *See, e.g.*, BLACK's LAW DICTIONARY 649 (6th Ed. 1990) (defining foreseeability as "the ability to see or know in advance; e.g. the reasonable anticipation that harm or injury is a likely result

from certain acts or omissions."); WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 890 (1986) (defining foreseeable as "being such as may reasonably be anticipated").

50. U.S.S.G. § 1B1.3, comment. (n. 1). The illustrations provided in the comments to § 1B1.3 indicate that members of drug conspiracies are to be sentenced in an individualized fashion, instead of on the basis of their participation in broad-ranging conspiracies. For example, illustration seven contains the following hypothetical:

Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount ..., rather than the much larger quantity imported by Defendant R.

U.S.S.G. § 1B1.3, comment. (n. 2(c)(7)).

51. *See*, U.S.S.G. Ch. 1, Pt. A(3).

defined in § 1B1.3(a)(1)(B) is prospective only, and consequently cannot include conduct occurring before a defendant joins a conspiracy.

 Without attempting to pretermit the district court's findings on remand, we observe that the instant case aptly illustrates the dangers of failing to limit temporally the sentencing accountability of a defendant. Both Carreon and Melendez were held responsible for the same quantity of drugs—quantities that arose from transactions occurring from 1985 to 1992. Yet according to the government's own admission, Carreon—unlike Melendez—was a late comer to the Melendez drug smuggling organization.[52] Basing Carreon's sentence on the same quantity of drugs as Melendez' would thus countermand the congressional goal of proportionality in sentencing—an important goal that, as the Sentencing Commission instructs, is met by focusing the sentencing of a defendant on his individual acts and omissions, not his criminal liability under the substantive law of conspiracy.[53]

As Carreon's presently constituted sentence is predicated on attribution of conduct occurring before he joined the Melendez conspiracy, we are constrained to remand for resentencing. We require that in resentencing Carreon the district court determine: 1) when Carreon joined the conspiracy (or conspiracies), 2) what drug quantities were within the scope of Carreon's conspiratorial agreement (or agreements),[54] and 3) of these drug quantities, which were reasonably foreseeable—prospectively only—by Carreon. We observe that evidence of prior conduct is not wholly irrelevant to these inquiries; rather, any knowledge that Carreon may have had regarding prior conduct will provide useful evidence of what Carreon agreed to and what he reasonably foresaw when he joined the conspiracy. The *O'Campo* court accurately explains when, and to what extent, such evidence of prior conduct is still relevant:

> We have emphasized that proving a "defendant knew what was going on" is not sufficient to establish co-conspirator criminal liability. . . . We similarly believe that the base offense level at sentencing cannot be based on mere knowledge of historic facts . . . [T]he relevant inquiry is to determine the foreseeable object to which the individual conspirator agreed. The past performance of the conspiracy, known to the late-joining co-conspirator, may be relevant to a careful analysis directed to the understanding such a co-conspirator has of the anticipated quantity of the drug distributions the conspiracy intends to undertake after he joins. . . .
>
> [T]he base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is the object of the conspiracy to distribute after he joins the conspiracy. In making the judgment what a co-conspirator can "reasonably foresee," the earlier transactions of the conspiracy before he joins but of which he is aware will be useful evidence. However, a new entrant cannot have his base offense level enhanced at sentencing for drug distributions made prior to his entrance merely because he knew they took place. Thus for example, if a defendant joins a conspiracy he knew previously engaged in distribution of extraordinarily amounts of drugs, his knowledge of those prior acts will inform the judgment about what he reasonably could have

**52.** As noted earlier, the government and Carreon vigorously contest whether Carreon joined the conspiracy in 1987 or 1989. As we must remand for resentencing, we do not attempt to resolve this issue on appeal.

**53.** We note that the district court wisely attempted to correct for the disparity in conduct between Melendez and Carreon by adjusting their base offense levels for their roles in the conspiracy: Melendez' base offense level was increased by two points because he played a supervisory role and Carreon's was decreased by two points because he was a minor participant. Nonethe-

less the starting point for the sentencing of Carreon—the "base offense level"—was premised on the faulty notion that relevant conduct could include conduct occurring before Carreon joined the Melendez organization.

**54.** As part of this finding, the district court will need to resolve whether Carreon entered one grand conspiracy (as contended by the government) or a separate, smaller one centered around the attempted bribery of Maynes (as contended by Carreon).

foreseen the conspiracy would entail in the future. He might, for example, then be found reasonably to have foreseen future distributions of similarly large quantities.[55]

The *O'Campo* court's explanation adequately describes our holding today.

Finally, in order to delineate properly the extent of our holding today, we address a valid concern raised by the government. Perhaps because of the 1992 Amendments to the Guidelines, the government is no longer advocating the inclusion of pre-joinder occurrences as relevant conduct as it was under *Edwards*. Nonetheless, the government remains concerned that, through temporal fortuity or manipulation, a defendant may avoid sentencing accountability for his conduct. The government poses the following hypothetical:

> Several persons agree to import a large quantity of drugs into the United States. After the drugs have been imported and distributed, the defendant—with full knowledge of the illegal objectives of the conspiracy—agrees to join the conspiracy to collect the money due for those drugs. The conspiracy ends—either because the members were caught or because they decided to disband—after completion of this transaction.

The government posits that a "bright line" prospective-only rule for relevant conduct would allow this hypothetical defendant to escape sentencing accountability for his conduct: all importation and distribution predated his joinder, and no drug quantities, post-joinder, are attributable to the defendant's collection function.

Although the government has indeed raised a valid concern, we observe that the government would be reading our holding today too broadly if it believes that we have foreclosed all sentencing accountability for its hypothetical defendant under § 1B1.3. Section 1B1.3 includes two primary grounds on which to hold a defendant accountable for conduct by others: subsection (a)(1)(B) for jointly undertaken criminal activity,[56] and subsection (a)(1)(A) for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."[57] Subsection (a)(1)(B) includes a "reasonable foreseeability" limitation; subsection (a)(1)(A) does not.[58] Furthermore, subsections (a)(1)(A) and (a)(1)(B) are separate and independent grounds for imposing sentencing accountability.[59]

Consequently, nothing we hold today regarding the "reasonable foreseeability" limit to subsection (a)(1)(B) would foreclose the government from holding its hypothetical defendant accountable under subsection (a)(1)(A). Clearly, such a defendant has "aided or abetted" a drug smuggling transaction when his agreed-to function is so causally and functionally intertwined with the transaction that it could not be completed absent his participation.[60] As such, that

**55.** 973 F.2d at 1025–26 (footnote omitted).

**56.** U.S.S.G. § 1B1.3(a)(1)(B).

**57.** U.S.S.G. § 1B1.3(a)(1)(A).

**58.** U.S.S.G. § 1B1.3, comment. (n. 2).

**59.** U.S.S.G. § 1B1.3, comment. (n. (a)(1)).

**60.** The commentary to § 1B1.3 provides two pertinent examples of sentencing accountability for aiding and abetting under subsection (a)(1)(A). In the first example the Commission posits:

> Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana.

> Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted the off-loading of the entire shipment by directly participating in the off-loading of that shipment (*i.e.*, the specific objective of the criminal activity he joined was the off-loading of the entire shipment). Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability.

U.S.S.G. § 1B1.3, comment. (n. (2)(a)(1)). The Commission's next example indicates that temporal sequence does not control sentencing accountability for aiding and abetting:

> Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken.... Defendant C is accountable for the money taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of the money was the specific objective of the offense he joined).

hypothetical defendant could be held accountable for that transaction under subsection (a)(1)(A).

## B. Review of PSRs of Coconspirators–Witnesses

 Most of the government witnesses testifying against Melendez were coconspirators in the Melendez organization who had themselves been subjected to various criminal charges. Melendez requested access to the PSRs of these witnesses in order to acquire any exculpatory or impeachment information under *Brady* and *Giglio*. Working from the established premise that information contained in a PSR is confidential, the district court denied this request.

Subsequent to the trial in the instant case, we decided *United States v. Jackson*,[61] in which we reconciled the need to protect the confidentiality of PSRs with the right of the defendant to have access to exculpatory and impeachment evidence under *Brady* and *Giglio*. We accomplished this reconciliation in *Jackson* by holding that the trial court should examine the PSR in camera and release any exculpatory or impeachment evidence to the defendant, while protecting the confidentiality of the rest of the PSR.[62]

Particularly in light of the absence of the coconspirators' PSRs from the record on appeal, the government concedes that we must remand here in light of *Jackson*. But the government contends that we must remand for "harmless error" analysis by the district court. Melendez, not surprisingly, argues that the district court's failure to anticipate *Jackson* warrants not just vacatur of his sentence, but also reversal of conviction and remand for a new trial. We agree with the government.

The remand-and-review approach is consistent with Rule 52's mandate that "[a]ny error[s] . . . not affect[ing] substantial rights shall be disregarded"[63] and our requirement that the defendant must show that the requested evidence was "material" before he can claim any infringement of a substantial right under *Brady* or *Giglio*.[64] In short, until the district court inspects the PSRs and compares them against the information Melendez had at trial, it is impossible to determine whether Melendez was in fact denied access to material *Brady* or *Giglio* information, and, if so, whether he suffered prejudice as a result of this denial.

Consequently, we remand to the district court to 1) conduct an in camera inspection and make appropriate findings as to whether the PSRs of the government witnesses contained any material *Brady* or *Giglio* information, and 2) compare those findings against the evidence Melendez had at trial to determine whether the failure to provide this information was harmless error. So that these findings and conclusions are reviewable on appeal, we require that the district court ensure that these PSRs are made a part of the record, albeit under seal if need be.

## C. Other Issues

The defendants have raised a host of other issues of varying merit. We briefly address them in turn.

### 1. Sufficiency of the Evidence as to Carreon

 Carreon contends that there was insufficient evidence to support his convictions on the conspiracy to possess and to import marihuana because the evidence at trial indicated that there were multiple conspiracies, instead of one overall conspiracy on which he

U.S.S.G. § 1B1.3, comment. (n. (2)(b)(1)). *See generally, e.g., United States v. Stone*, 960 F.2d 426, 433 (5th Cir.1992) (observing that a defendant "aid and abets" a crime within the meaning of 18 U.S.C. § 2 when the defendant 1) associates with the criminal venture, 2) participates in the venture, and 3) seeks by action to make the venture succeed).

**61.** 978 F.2d 903, 908–09 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2429, 124 L.Ed.2d 649 (1993).

**62.** *Id.* at 909.

**63.** FED.R.CRIM.P. 52(a).

**64.** *E.g., United States v. Merida*, 765 F.2d 1205, 1216 (5th Cir.1985) (placing burden on defendant to show that the requested *Brady* information was material).

was indicted. According to Carreon, the instant case involves at least two conspiracies: the bribery-importation conspiracy involving Maynes (of which Carreon concedes he was a member), and an earlier importation conspiracy centered around Melendez and the government witness, Charles Aragon. Even if we were to assume *arguendo* that this case involves multiple conspiracies, Carreon's argument fails for lack of prejudice to a substantial right.[65]

■ We have long held that "when the indictment alleges ... a single conspiracy, but the 'government proves multiple conspiracies and a defendant's involvement in at least one of them, then there is no variance affecting that defendant's substantial rights.'"[66] This holding is subject to the caveat that substantial rights are affected when the defendant is subjected to transference of quilt, that is, the danger that the defendant may be convicted because of his association with, or conspiracy for unrelated purposes with, codefendants who were members of the charged conspiracy.[67]

Here, the evidence adequately demonstrates that Carreon joined with Melendez to engage in activity that was part of the charged conduct—on more than one occasion Carreon was taped discussing the importation and distribution of marihuana with Maynes. This discussion eventually led to the actual importation of more than the minimum charged quantity of marihuana. Carreon's argument is thus reduced to asserting that he did a little bribing, a little smuggling, and a little distributing, just not as much as Melendez and the others. Such an argument negates any claim of an infringement on a substantial right.

### 2. Bill of Particulars and Prejudice

■ Carreon contends that the district court erred in denying his motion for a bill of particulars, and that this error caused him substantial prejudice. According to Carreon's theory, the bill of particulars would have put him on notice that the majority of the government's evidence concerned a conspiracy separate from the one he joined. Carreon complains that the evidence from this other conspiracy was improperly used against him to attribute "guilt by association." In sum, Carreon insists that, had he had the bill of particulars, he would have been able to sever his trial from Melendez.

■ We conclude that Carreon's argument fails for lack of demonstrated prejudice. Even if we were to assume that the district court's denial of the bill of particulars was an abuse of discretion—a highly doubtful assumption[68]—Carreon has failed to show that his rights were substantially prejudiced by the ultimate harm flowing from denial, namely, the failure to sever. To establish harm from failure to sever, Carreon would have had to show that the joint trial "compromise[d] a specific right [of his], or prevente[d] the jury from making a reliable judgment about guilt or innocence."[69] In contrast, Carreon claims no specific harm from the failure to sever other than to assert—baldly and without supporting facts—

---

**65.** The government correctly asserts that whether the evidence establishes a single or multiple conspiracy is a question of fact for the jury. *E.g., United States v. Ellender,* 947 F.2d 748, 759 (5th Cir.1991). The problem here is that, as Carreon was charged and convicted of conspiracy to distribute only 100 or more kilograms of marihuana, it is impossible to tell whether the jury found that Carreon was a member of one grand conspiracy or of a separate, smaller conspiracy involving the attempted bribing of Maynes.

**66.** *Jackson,* 978 F.2d at 911 (quoting *United States v. Richerson,* 833 F.2d 1147, 1155 (5th Cir.1987)).

**67.** *United States v. Hernandez,* 962 F.2d 1152, 1159 (5th Cir.1992).

**68.** Only when a district court clearly abused its discretion, will a judgment of conviction be reversed for the denial of a Bill of Particulars. *E.g., United States v. Vasquez,* 867 F.2d 872, 874 (5th Cir.1989). In the instant case, the government provided Carreon with substantial discovery materials revealing the government's theory of the case, and the prosecutor further explained this theory during pretrial hearings for severance. Even Carreon's counsel had to admit that he had received "a lot of discovery." Under these circumstances, it is unlikely that the district court clearly abused its discretion in denying Carreon's request for more information through a bill of particulars.

**69.** *Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317, 325 (1993).

that such failure violated his right to a fair trial under the Due Process Clause. But, as noted above, this assertion is negated by the evidence at trial incriminating Carreon—which was direct, straightforward, and substantial.

### 3. *Plain Error and Severance*

In pretrial motions, Carreon requested and received severance of his and Melendez's trial from that of the other coconspirators. Carreon admitted that he was properly joined with Melendez because of their purported participation in a scheme to bribe Maynes. On appeal, Carreon now argues that he should also have been severed from Melendez.

 Because Carreon failed to object to joinder with Melendez—indeed, he requested it—we review the district court's failure to sever here only for plain error. Plain error is "error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of (the) judicial proceedings and would result in manifest injustice." [70] As noted above, substantial evidence indicates that Carreon was involved in a conspiracy to possess and to import marihuana. The district court's failure to sever plainly did not cause any "manifest injustice" here.

### 4. *Heightened Standard of Proof for Certain Sentencing Facts*

 Carreon contends that the district court's findings of drug quantities used to sentence him are subject to a "beyond a reasonable doubt" burden of proof.[71] Car-

reon reasons that this higher standard is required here because the "sentencing fact is a 'tail that wags the dog of the substantive offense.'" [72] Specifically, Carreon was indicted and eventually found guilty of conspiring to possess and to import 100 or more kilograms of marihuana, but was sentenced based on a finding that the quantity involved was around 130,000 kilograms. The guideline range for the minimum quantity found by the jury is 63 to 78 months;[73] Carreon was sentenced to 235 months based on the sentencing findings.

Our recent opinion in *United States v. Mergerson*[74] disposes of Carreon's claim. In *Mergerson* the relevant sentencing fact—that the defendant conspired to possess more than one kilogram of heroin—increased his sentence from thirty years to life under the Guidelines to mandatory life in prison without the possibility of release under 21 U.S.C. § 841(b)(1)(A)(i).[75] We concluded that the increase in the minimum sentence from thirty years to life "did not have the dramatic effect upon sentencing necessary to require the reasonable doubt standard to be considered." [76] The difference here—between approximately six and almost twenty years—likewise does not constitute such a dramatic effect that it would justify considering, much less imposing, the higher burden of proof.

### 5. *Sufficiency of the Evidence as to Melendez*

Melendez was found guilty of conspiring to import 100 or more kilograms of marihuana, but was acquitted of conspiring to possess that amount and of bribing a public official.

**70.** *United States v. Pofahl,* 990 F.2d 1456, 1479 (5th Cir.) (internal quotations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993).

**71.** Carreon does not dispute that the general burden of proof for sentencing facts is a preponderance of the evidence, *see, e.g., United States v. Angulo,* 927 F.2d 202, 205 (5th Cir.1991); instead, he argues that the consequences flowing from the sentencing findings here justify the higher burden of proof.

**72.** *United States v. Mergerson,* 4 F.3d 337, 343, 344 (5th Cir.1993) (quoting *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986)).

**73.** Section 2D1.1 of the Guidelines imposes a base offense level of 26 for amounts between 100 and 400 kilograms of marihuana. Because Carreon falls within the criminal history category of I, this quantity results in the calculation of a 63 to 78 month range under the Sentencing Table contained in Chapter Five of the Guidelines.

**74.** 4 F.3d 337 (5th Cir.1993).

**75.** *Id.* at 343.

**76.** *Id.* at 344.

Although substantial evidence exists to support Melendez's importation conviction if the testimony of the government's witnesses is accepted as credible,[77] we pretermit further discussion on this issue as we must remand Melendez's conviction for review of the PSRs of the coconspirators-witnesses.

### 6. Sentencing Accountability for Acquitted Conduct

 Melendez also argues that the district court violated the Due Process Clause when it attributed marihuana to him that was part of the possession conspiracy for which he was acquitted. Melendez's contention—that a district court cannot consider quantities related to a conviction for which he was acquitted—is meritless. A district court may base a defendant's sentence on conduct for which the defendant was acquitted because the government need only establish sentencing facts (unlike the elements of the crime) by a preponderance of the evidence.[78]

## III

## CONCLUSION

We hold today that relevant conduct as defined in § 1B1.3(a)(1)(B) is prospective only, and consequently relevant conduct under § 1B1.3(a)(1)(B) cannot include conduct occurring before the defendant joins a conspiracy. As Carreon's sentence includes quantities arising out of drug transactions occurring before he joined any conspiracy, we must vacate Carreon's sentence and remand for resentencing. We also conclude that the absence of sentencing findings as to both Carreon and Melendez warrants remand for findings and for resentencing both defendants.

Finally, we must remand Melendez's conviction for findings as to whether the PSRs of the coconspirators-government witnesses contained material *Brady* or *Giglio* information, and, if they do contain such information, whether failure to disclose such information was harmless error.

For the foregoing reasons, the sentences of Carreon and of Melendez are VACATED and their cases REMANDED for resentencing; and the conviction of Melendez is REMANDED (but not reversed) for additional findings by the sentencing court.

---

77. For example, coconspirator Charles Aragon testified to importing and stashing marihuana for, among others, Armando Melendez and his father Chuy. Both Aragon and coconspirator Ray Donaldson testified to flying planeloads of marihuana supplied by Armando Melendez. Aragon and another coconspirator, Jose Guzman, testified to transporting marihuana to Chicago at Melendez' direction. Finally, the undercover agent Maynes testified to meeting Melendez twice, receiving $2,000 in cash after the first meeting, and discussing smuggling marihuana with Melendez at the second.

78. *E.g.*, *United States v. Allibhai*, 939 F.2d 244, 254 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 967, 117 L.Ed.2d 133 (1992).